Charles BROWNING, Browning & Woodbury Co., and Griffin Mortgage Co., Appellants,

v.

Raymond E. JOHNSON and Robert C. Johnson, Appellees.

No. 05–86–00028–CV.

Court of Appeals of Texas, Dallas.

March 13, 1987.

Rehearing Denied May 1, 1987.

John O. Jones, Dallas, for appellants.

Steven G. Condos, Dallas, for appellees.

Before DEVANY, HOWELL and THOMAS [1], JJ.

HOWELL, Justice.

Charles Browning, Browning & Woodbury Company, and Griffin Mortgage Company (Brokers) appeal the entry of a judgment n.o.v. in their suit against Raymond E. Johnson and Robert C. Johnson (Developers) for breach of an exclusive mortgage brokerage contract. We reverse and render.

Developers are in the business of acquiring land and constructing buildings to be sold by them. In 1977, they acquired an option to purchase a seven-acre tract on which they desired to build an apartment complex. On April 13 of that year, Developers entered into an exclusive agency contract granting Brokers forty-five "banking days" to procure a commitment to provide permanent financing upon completion of the proposed development.[2]

---

1. The Honorable Ted M. Akin was a member of the submission panel and attended deliberations in this case. However, he was no longer a member of the court when this opinion was handed down. His successor, the Honorable Linda Thomas, has participated in his stead.

2. The portion of the agreement germane to this appeal provided as follows:

In consideration of your efforts, which we hereby acknowledge, ... we hereby grant you the exclusive right to act as our agents in the following matter:

(1) *Exclusive Agent* in connection with the procurement of a permanent loan commitment by you which shall be subject to our approval.

(2) *Exclusive Period*: You shall have 45 banking days to submit a mortgage loan commitment agreement in principal [sic] on the subject property outlining the general terms and conditions. If at the end of said forty-five (45) day period said commitment has not been received by us, (which we have approved of), then this agreement shall be null and void except as provided in paragraph 4 below.

Pursuant to this agreement, Brokers prepared a portfolio demonstrating the feasibility of Developers' proposal and submitted it to potential lenders, but through the first part of July, no acceptable loan commitment had been secured.

On July 7, co-defendant Robert Johnson executed an agreement with Lomas & Nettleton Company, another mortgage brokerage firm, which purported to grant Lomas & Nettleton an exclusive agency for the purpose of obtaining permanent financing for the project. Eighteen days later, Lomas & Nettleton submitted to Developers a proposal from Seamen's Savings Bank of New York. Developers ultimately accepted this offer and paid Lomas & Nettleton a commission equal to one percent of the amount of the loan. However, Developers refused to pay any commission to plaintiff Brokers.

In 1981, Brokers commenced this action alleging two theories of recovery. The first theory, to which the parties devoted the greater amount of their attention at trial, was that Brokers timely performed the contract because they had designated co-defendant Robert Johnson as their agent for the purpose of procuring a loan from a lender obtained by Lomas & Nettleton—apparently on the premise that said Johnson was acting for the mutual benefit of both Brokers and Developers. Alternatively, Brokers pleaded that Developers prevented the performance of the contract by executing an agreement with Lomas & Nettleton and by taking the Seamen's Bank proposal before Brokers' exclusive agency terminated.

Developers denied that Robert Johnson acted as Brokers' agent, and claimed that Brokers orally agreed to modify the contract to permit Developers to seek financing through Lomas & Nettleton. Developers further contended, in effect, that even if they breached the exclusive agency agreement, Brokers were not entitled to

recover because the loan from Seamen's Bank was not accepted until after Brokers' contract expired and because Brokers' failure to perform was not excused by the acceptance of the Seamen's Bank loan.

Answering special issues, the jury found that the plans and specifications were approved by Developers on June 15, 1977 (which event started the running of the forty-five day exclusive agency period), that Brokers thereafter submitted a loan commitment which was subsequently approved by Developers on July 25, 1977, that the commitment became "fully executed" on August 12, 1977 and that Brokers had in fact designated Robert Johnson as their agent to negotiate a loan through Lomas & Nettleton.

Although the verdict favored Brokers in all respects, the trial court granted judgment n.o.v. holding that no evidence supported the jury findings that Brokers submitted a commitment to Developers on July 25, 1977 or that Robert C. Johnson had been designated by Brokers as their agent. The finding that a commitment was submitted on July 25 obviously referred to the Seamen's Bank commitment, the only proposal ever submitted by anyone. Inasmuch as the trial court held that there was no evidence that Robert Johnson was acting for Brokers, it necessarily found no evidence that Brokers procured a commitment on July 25, because Brokers' only connection to the Seamen's Bank loan was the asserted agency of Robert Johnson.

Assuming that the trial court was correct in holding that Robert Johnson was not acting on behalf of Brokers, we nevertheless hold that the court erred in denying recovery to Brokers because legally sufficient evidence supported every element of Brokers' alternative theory of recovery, i.e., that Developers breached the exclusive agency contract by accepting a loan through Lomas and Nettleton. The jury's answers to the special issues, when con-

---

The 45 banking day period shall commence upon receipt by you of the plans and specifications package approved by us from the group architects.

The group shall advise us when these documents are received by you.

(3) *Commissions:* If you are successful in your efforts in placing an acceptable mortgage loan commitment, you will be paid a fee equivalent to one percent (1%) of the mortgage loan amount when the commitment is fully executed.

sidered in light of the pleadings and the evidence, reflect that every fact issue in controversy on this alternate ground was resolved in favor of the mortgage brokers.

A trial court may render judgment contrary to the jury's verdict only if a directed verdict would have been proper. Tex.R. Civ.P. 301. A directed verdict is not proper unless the plaintiff has failed to present some legally cognizable evidence on some essential element of his case or the defendant has conclusively established every element of an affirmative defense. See 3 R. McDonald, *Texas Civil Practice in District and County Courts*, § 11.28.2 (1983 rev. ed.); see also, e.g., *Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686 (1951) (trial court erred in directing a verdict when evidence insufficient as to one ground, but pleadings and evidence authorized submission of a different ground).

Brokers alleged alternatively that Developers breached the contract by obtaining a loan through Lomas and Nettleton before the expiration of the exclusive agency period. The admitted facts plus the jury findings establish liability on this theory. Developers admit that they obtained a mortgage loan for the project in question through Lomas & Nettleton, to whom they granted a supposed exclusive agency. Responding to a special issue, the jury rejected the contention that the exclusive agency agreement with Brokers was modified. As a matter of simple logic, two exclusive agency contracts could not have existed simultaneously. If the Lomas and Nettleton contract overlapped the contract with Brokers, then the Lomas and Nettleton contract was a breach of the contract with Brokers.

Brokers' contract provided that the exclusive agency period began when Brokers received plans and specifications from the architects which had been "approved by us [Developers]." The parties stipulated that Brokers received these plans on May 25, but could not agree when the plans were approved. The wording of the contract would indicate that the parties had anticipated that Developers would approve the plans before the architects delivered them

to Brokers, but there is no direct evidence as to when, if ever, that Developers approved the plans. Developers sought to establish May 30 as the date that they approved the plans by introducing Brokers' abandoned pleading alleging that the plans were approved on that date. Accepting Developer's own contention in this respect, it follows that a breach of contract occurred on July 7, 1977 when Developers admittedly executed an "exclusive" agency contract with Lomas and Nettleton. However, breach of contract does not prove damages. Broker's did not show how the wrongful signing of an agreement with Lomas and Nettleton prevented Brokers from securing a commitment through their own resources, the very service which Brokers undertook to perform and which they never performed.

On the other hand, during the exclusive agency period, if a commitment was secured by another broker, that commitment had to be considered as if it were procured by plaintiff Brokers. Otherwise, the exclusive rights provision of the contract would be nugatory. Such is the very heart of an exclusive agency agreement. Of what value to a broker is the promise that his agency will be exclusive unless the principal assures the broker that a commission will be paid if performance is obtained, even from another broker during the exclusive agency period? From the standpoint of the principal, why should he not be required to pay if the bargained performance is received within the bargained time? The fact that he must also pay someone else is the penalty that the principal incurs by promising the first broker that his agency is exclusive and thereafter breaching that promise.

We agree that the courts have exhibited a tendency to construe exclusive agency agreements rather narrowly. However, the case in hand is readily distinguishable from Developers' authorities. In *Alba Tool & Supply v. Industrial Contractors*, 585 S.W.2d 662 (Tex.1979), the court discussed the distinction between an exclusive agency and the exclusive right to sell. It appears to be the established rule that un-

der an exclusive agency, "the principal has a right to sell [*directly and in person or through his regular employees*] without the payment of a commission to the agent." *Id.* at 664; *accord Dallas Electric Supply Co. v. Branum Co.*, 143 Tex. 366, 185 S.W.2d 427 (1945). However, the distinction was not controlling in *Alba* because the court proceeded to hold that an exclusive right to sell had indeed been created and declared the commission payable. Likewise, the distinction does not bear upon the case at hand because Developers here attempted to appoint another agent, something that they cannot do even under a simple exclusive agency agreement. The question whether Developers retained the right to deal directly with a lender is immaterial to the case.

Appellees also rely upon *Neese v. A.A.A. Realty Co., Inc.*, 159 Tex. 403, 407, 322 S.W.2d 597 (1959); we do not find it to be in point. Motel owner Neese gave an exclusive listing to Broker A. During the listing, Broker B approached Neese for authority to sell. Neese gave that authority subject to a price increase sufficient to pay a full commission to both A and B, without reducing the owner's net receipts. Broker B then caused the owner to sign a listing card with no reference to the terms of employment except that it was captioned "Exclusive Listing Agreement." The owner testified that Broker B explained that the caption only meant that if Broker B secured a buyer, the commission contracted to Broker B was exclusive to him and would not be shared with Broker A. The jury found in the owner's favor. The supreme court, with three justices dissenting, held that the contract was ambiguous and that the trial court did not err in allowing the owner's testimony.

Neither do we consider *Neese* to be applicable. It was a suit by the first broker, not the second. In our case, ambiguity was neither pleaded nor submitted; we know of no possible construction of the written agency agreement that would have authorized Developers to concurrently deal with another agent. Developers contended at the trial that they notified Brokers of a desire to enlist the services of Lomas and

Nettleton before doing so and that Brokers consented, but the jury refused to accept their modification claim. Developers' cases are not applicable.

Just as the jury rejected the claim of modification, the jury also rejected the contention that the plans were approved on May 30. Instead, the jury found an approval date of June 15, 1977. There was some evidence to support the June 15 date because co-plaintiff Browning testified that Developers did not approve the plans until June 15. Although he admitted that he never received express notice that the plans had been approved, he stated that approval was implicit from Johnson's conduct in carrying the portfolio containing those plans to Lomas and Nettleton. We agree. Browning testified to a telephone conversation with Robert Johnson in which Johnson stated that he had taken the portfolio to Lomas and Nettleton.

If the exclusive agency commenced on June 15, then the forty-five banking day period expired on August 18. In so holding, we interpret the term "banking days" as excluding weekends and Independence Day as well, all being dates when banks are not ordinarily open. We also take judicial notice of the calendar.

The jury found that the mortgage loan commitment from Seamen's Bank was "submitted" to Developers on July 25, 1977, a period well within forty-five banking days after June 15. Even though the submittal did not emanate from "Plaintiff" as the issue was framed, the jury nonetheless found that a commitment was submitted on July 25, 1977. Neither is there any significant contest that July 25, 1977 was the date that Developers received the Seamen's Bank commitment.

■ Developers contend that they are without liability under their contract with Brokers unless the commitment was both received by them and accepted by them within the forty-five day period. They contend that they did not accept the Seamen's bank loan until September 22, 1977. We find that the contract was unclear whether Developers' acceptance had to occur within

the forty-five banking days to "submit a ... commitment." Obviously, if we hold that the proposed commitment was required both to be submitted *and accepted* within the forty-five days, we have shortened Brokers' deadline to submit the commitment. The contract further provided that "[if] *at the end* of [the 45 days.] said commitment *has not been received* (which we have approved of), the agreement shall be null an void." (emphasis added). The parenthetic provision concerning approval, being the only provision of the contract relating to acceptance or approval of the loan commitment, is at odds with the language outside the parentheses to the extent that it indicates that the acceptance must also occur within the forty-five days. We reject any such interpretation.

Clearly, the primary, if not the only purpose of the quoted provisions was to fix a time of performance for the party undertaking affirmative performance. The opposing party, having the passive obligation of payment, had no duty to pay unless performance occurred within the time specified. Of course, the passive party was insisting that any commitment that was submitted be acceptable. This was the parenthetic proviso. However, to go further and hold that this proviso shortened the time for affirmative performance would necessarily introduce a contract provision over which the affirmatively performing party had no control. It would place it within the power of the passive party to deprive the right to compensation simply by delaying acceptance beyond forty-five days.

Surely, this was not the bargain contemplated by the parties. We adopt a construction that is reasonable from the standpoint of both parties. Brokers were granted a time span until the end of the last hour of the forty-fifth banking day to "submit" a commitment; the commission agreement was to become null and void unless Developers *"received"* a commitment by such time. Developers stipulated that they would not become obligated to pay a commission unless they accepted the commitment that was received. However, Developers had no reason to bargain for a limit upon the time within which they, themselves, must accept; the timing thereof was entirely within their control. Neither did brokers have any interest in bargaining away, as acceptance time, any part of Brokers' own performance time. At the time the contract was signed, it would not have served the legitimate interest of either party to expressly stipulate that both submittal and acceptance must occur within the 45 day period. We therefore hold that the contract did not so require.

We conclude that Developers did indeed receive the bargained performance from some source. That performance was submitted to them within the forty-five day exclusive agency period. Inasmuch as the agency was exclusive, it was immaterial whether or not Brokers were the procuring cause of the bargained performance. The contract fixed a deadline for Brokers to submit a loan commitment to Developers and a commitment was, in fact, received by Developers from some source prior to the deadline. Acceptance by Developers was a condition upon Developers' obligation to pay, but it is clear that they did accept the Seamen's Bank loan. Developers could not defeat their own liability by delaying their acceptance because the contract, properly construed, placed no time limit on acceptance.

Exclusive agency contracts are commonplace in the real estate field. Real estate sales brokers almost invariably ask owners desiring to sell for an exclusive listing period. In return, the broker expressly or impliedly contracts to exert special efforts to secure an acceptable buyer. To this end, he is expected to expend time and money in advertising and promoting the property. If he fails to secure a buyer, the agent loses not only his time but his money. Owners generally sign exclusive real estate "listing" contracts because they provide valuable benefits to the owner. The expense of advertising and promoting is shifted to the broker. During the exclusive period, the owner is assured that the broker will spend a significant amount of time and effort that is specifically calculated to sell the owner's property. In short, an exclusive

listing contract provides benefits to and places corresponding burdens on both parties.

The contract in litigation was not an exclusive listing contract for the sale of the premises, but the distinctions are small. All parties were active in the real estate industry and presumably well-versed in its customs and practices. Each side accepted the burdens of an exclusive agency agreement in order to secure the corresponding benefits. The dissent hypothesizes that this opinion opens the door for unscrupulous and slothful brokers to solicit exclusive brokerage contracts and then do nothing, secure in the knowledge that they will be entitled to a commission if a transaction fortuitously occurs during the exclusive period. Suffice to say that no facts to such effect were pleaded, placed in evidence, or proved in the instant case.

If a broker does not comply with his part of the bargain, the opposing party to an exclusive agency agreement is not without remedy—discharge the offending broker for his failure to perform—fire him. In our case, did the defendant developers ever notify plaintiff brokers of an intent to terminate the exclusive agreement for failure to provide the agreed performance? Although the proposition was disputed, Developer never pleaded or requested issues on a claim that Brokers failed to perform as agreed. For certain, brokers were never notified by letter of any termination for cause, the only business-like way to handle the matter.

To the contrary, the record reflects that Brokers prepared a brochure concerning the subject property. The brochure was Brokers' work product, for which Brokers anticipated they would be compensated through a commission on the anticipated loan. Undoubtedly, its preparation required time, effort and money on the part of Brokers. On June 15, 1977, and during the life of the exclusive agency agreement, Developer Robert Johnson came to Broker Browning's office during his absence, obtained the brochure or a counterpart thereof and took it to a competing broker. From all appearances, the same brochure was submitted to Seamen's Bank and was a factor in persuading Seamen's Bank to issue a commitment. Was this a business-like manner to terminate a broker with whom the owner of property was dissatisfied? We think not. Is it possible to declare on this record that plaintiff Brokers did not earn their commission? Again, we think not. Plaintiffs' brochure apparently contributed to help persuade Seamen's Bank to make the loan. At a minimum, defendant Developers, who plainly breached the terms of the exclusive agency agreement, have not carried the defensive burden of proving that the purloined brochure did not contribute to the procurement of the loan.

It is clear that Developers did, in fact, receive the bargained performance during the exclusive agency period. They knowingly executed two overlapping "exclusive" agency contracts. Having chosen to do so, and having chosen to accept the benefits of having two "exclusive" brokers working for them simultaneously, why should Developers not be held to pay two commissions? At a minimum, should they not be held to prove that plaintiff Brokers were terminated for cause or that grounds for termination existed or that the brochure played no part in the Seamen's loan, or to otherwise prove that Brokers were not damaged? Suffice to say Developers have not carried any such burden.

■ The dissent argues that Developers had an "absolute right" to reject any loan proposal that they received. Presumably, in the dissent's view, if Brokers had submitted another loan proposal to Developers on July 28, 1977, three days after the Seamen's proposal was submitted and well within the 45 days, Developers would have had an "absolute right" to reject Broker's proposal, to accept the Seamen's proposal and to owe nothing to Brokers, even if the terms of the two commitments were, for all practical purposes, identical. We deny that Developers had the right to reject any and all loan proposals at whim. Such interpretation would indeed make the exclusive agency agreement an illusory contract.

This was a commercial transaction between businessmen experienced in the particular field. It was not a contract to paint someone's personal portrait with "satisfaction guaranteed." We continue to adopt a construction viewing the transaction as of the time that the contract was signed and so as to provide reasonable protection to both parties. We interpret the contract as providing that a *reasonable* loan commitment must be accepted or paid for and that Developers were not to reject a loan commitment that reasonably complied with the discussions of the parties, the usages of the industry and the needs of Developers. The proposition need not be further explored because the Seamen's proposal was a reasonable one as exemplified by the fact that Developers utilized it. Developers had no "absolute right" to arbitrarily reject any proposal brought to them by Brokers and thereby deprive Brokers of a commission.

The jury verdict, plus a fair and reasonable interpretation of the contract, leads to the conclusion that Developers, by their own conduct, knowingly exposed themselves to the eventuality that they would be forced to pay two brokers for one single performance: judgment will go accordingly. No damage issue was submitted and none was necessary because the parties have stipulated the amount to which Brokers would be entitled if judgment were to go in Brokers' favor. Inasmuch as the verdict, plus the uncontroverted facts, entitles Brokers to recover the stipulated amount, the judgment below is both REVERSED AND RENDERED.

THOMAS, J., files a concurring opinion.

DEVANY, J., files a dissenting opinion.

THOMAS, Justice, concurring.

After reviewing the briefs, oral argument and record in this case, I agree that the judgment of the trial court must be reversed and judgment rendered for the brokers, albeit for different reasons. Thus, I concur.

The first issue to be resolved is, in my view, whether the trial court correctly rendered judgment notwithstanding the jury's verdict, which in turn depends on whether the trial court could have directed a verdict in favor of the developers at the close of the evidence. As Justice Howell points out, a directed verdict would have been proper only if the mortgage brokers had failed to adduce legally competent evidence to support an affirmative finding on every element of a ground of recovery, or if the developers conclusively established all elements of an affirmative defense. If *any* ground of recovery is supported by the evidence and is not precluded by an affirmative defense, then the trial court may not direct a verdict to the contrary. *Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686, 688 (1951). Hence, rendition of judgment notwithstanding the verdict would also be improper.

Viewed in the light most favorable to the brokers, legally sufficient evidence indicated that the developers not only breached the exclusive agency agreement, but also anticipatorily repudiated the contract by accepting the proposal from Lomas & Nettleton before the forty-five banking days expired, thus excusing the brokers' failure to perform the agreement. *See Smith v. Lipscomb*, 13 Tex. 532, 538 (1855) (stating that when one party to a contract prevents the other party from performing, the other party is entitled to recover as if it fully performed). Because some evidence supported this alternate ground of recovery, I agree that the trial court erred in rendering judgment notwithstanding the verdict because a directed verdict would have been improper in light of the holding in *Staats*.

The more difficult question, however, is whether the cause should be remanded for a second trial, or whether this court should render the judgment that the trial court should have rendered. The jury's finding that the exclusive agency commenced on June 15, 1977 was unchallenged in the trial court and has not been attacked here. Therefore, I treat that matter as decided. It was uncontroverted that if the forty-five banking days commenced on June 15, they would have expired on August 18, 1977.

Therefore, that issue is established as a matter of law. The only other finding necessary to support the brokers' "prevention of performance" ground of recovery was that the developers accepted a loan through another agent during the brokers' period of exclusivity.

The jury answered "August 12, 1977" to the following special issue: "What do you find ... was the date that the mortgage loan commitment submitted by [p]laintiffs to [d]efendants and approved by [d]efendants became fully executed?" Thus, if this special issue can be read as a determination of the date on which the proposal from Lomas & Nettleton became final, then the brokers established every element necessary to show an anticipatory repudiation and prevention of performance by the developers and there would remain nothing to be decided by a retrial.

I conclude that the answer may be so construed when considered in light of the evidence. Obviously, the brokers submitted the issue in terms of the "loan commitment submitted by plaintiffs" because of their novel theory that the younger Johnson, one of the principals, acted as their agent. However, the only evidence relating to a commitment accepted by the developers concerned the offer obtained from Seamen's Bank by Lomas & Nettleton. Although the developers testified that they did not accept the offer until after August 18, the documentary evidence indicates that it was accepted on August 12. Therefore, I conclude that the jury, with some support in the evidence, has already found that the developers effectively repudiated their contract with the brokers before the brokers were contractually obligated to perform. There is no necessity of relitigating this issue. In light of the stipulation as to the amount of damages, judgment should be rendered for the brokers.

DEVANY, Justice, dissenting.

I respectfully dissent.

The broker agreement, by its very terms, certainly contemplated that broker would procure a loan proposal. If the broker had procured such a proposal and the developer had deliberately waited until after the 45-day period to accept such proposal, then of course the commission would be earned by the broker, according to the very terms of the broker contract.

The majority would place the developer in the untenable position where the broker could sit back during a 45-day exclusive period and do nothing; then, if during that 45-day period the developer received a proposal from another source which he honorably did not accept, in order to give the broker a full opportunity to perform and earn his commission, the developer would never be able to accept that proposal without incurring a commission expense to the broker who sat and did nothing.

I will agree that the developer's second exclusive agreement with Lomas and Nettleton was unenforceable during the 45-day period protected by the broker's contract. But once the broker let his 45 days elapse without submitting a proposal of his own, he could not earn a commission. It should be noted that even if the broker submitted a proposal, he could not earn a commission unless the developer accepted it.

A reasonable interpretation of the broker contract as contemplated by the parties would be that the developer expected performance by the broker within a 45-day period. If that performance was later accepted, the broker earned a commission. Any negotiations by the developer with outside parties would be subject to that exclusive right of the broker. In this instance, the broker did not perform during his exclusive 45-day period. I recognize that the broker's *right* to perform during that 45-day period could not be interfered with, and the developer would be obligated to pay the broker a commission if the developer received a proposal *from the the broker* and thereafter accepted it.

It should be noted that the broker contract gave the developer the absolute right to deny the broker a commission by not accepting any proposal submitted by the broker. The majority would rewrite the contract to take this absolute right away from developer.

The broker contract provides at paragraph numbered "(2)" that: "if at the end of said forty-five (45) day period said commitment [procured by you] has not been received by us, then this agreement shall be null and void." At paragraph "(4)" the parties provided: "If a permanent loan commitment is executed after the expiration of the 45 banking day period with any permanent lender *with whom you have had correspondence* on the subject property, all terms and conditions of this agreement shall survive and apply as stated herein." (Emphasis added.)

Hence, the parties specifically provided for a commission to the broker after the 45–day period *only* for a lender supplied by the broker. The majority opinion enlarges on the plain meaning of the above quoted language to give the broker a commission on a loan not procured by the broker, contrary to the express language of the contract.

For the reasons stated, I would affirm the judgment of the trial court.