**Don J. GENITEMPO, Appellant,**

v.

**CHARDEE, INC., d/b/a Sea Lake Yacht Sales, Appellee.**

**No. A14–91–00523–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 6, 1992.

Rehearing Denied March 5, 1992.

Robert G. Miller, Houston, for appellant.

Andrew P. McCormick, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## OPINION

ELLIS, Justice.

This is an appeal from a judgment for breach of a brokerage agreement which was tried to the court without a jury. The trial court awarded appellee the principal sum of $7,400, pre-judgment and post-judgment interest and attorney's fees. Appel-

lants argue that the trial court erred in entering judgment in favor of appellee. We affirm.

On February 4, 1988, appellant entered into an agreement (Central Agency Agreement) with appellee whereby appellant agreed to pay appellee a 10% commission on the gross sales price of a vessel known as the "Oz" in exchange for appellee's brokerage services in managing the sale of the vessel. This agreement remained in full force and effect for a period of six months from February 4, 1988 and continued thereafter until the vessel was sold or until the agreement was cancelled by either party's written notice to the other to be effective 30–days after receipt. Neither party cancelled the agreement. Farr International contacted appellant regarding a buyer for the vessel. Appellant did not inform appellee of this potential buyer and signed a contract with Farr International to sell the vessel for $74,000. Appellee received no commission from the sell of the vessel and filed suit for breach of contract. Appellant filed a general denial and then at trial defended on the theory that appellant believed the contract had expired on its own terms and was, therefore, not obligated to pay the 10% commission to appellee.

The agreement read as follows:

### CENTRAL AGENCY AGREEMENT

Name of Vessel: OZ Make: Farr 37 Year: 1987

Approximate Length: 37′ Hull#: 9, hereinafter referred to as the VESSEL.

1. In consideration of the covenants hereinafter contained, DON J. GENITEMPO, hereinafter referred to as the OWNER, does hereby appoint SEA LAND YACHT SALES, hereinafter referred to as the BROKER, as his (her, their) sole central agent to manage the sale of the VESSEL.

2. The VESSEL is offered for sale at an asking price of $89,000 and no other price will be quoted without specific authorization from the OWNER.

3. The BROKER agrees:

    A. To prepare a complete written listing describing the VESSEL, including photographs when possible, and to cooperate with and distribute information to other brokers with whom the BROKER judges to be properly qualified to negotiate a sale of the VESSEL.

    B. To answer as completely and as promptly as possible all inquiries regarding the VESSEL and to take such steps as advisable, in accordance with customary business procedure, to consummate a sale of the VESSEL.

    C. To keep cooperating brokers informed as to the location, price and availability of the VESSEL, supply them with any additional information requested if available and make all arrangements for them to inspect the VESSEL.

    D. To submit all offers made in writing to the BROKER or received from other cooperating brokers, assist cooperating brokers in closing a sale of the VESSEL and pay cooperating brokers their portion of the herein agreed to commission.

    E. To advertise the VESSEL as the BROKER deems appropriate and list the VESSEL in the Gulf Coast Yacht Brokers Association's multiple listing service.

4. The OWNER agrees:

    A. To furnish the BROKER with listing specifications, photographs, and inventory of the VESSEL'S equipment, and whatever other plans or information may be available and to keep the BROKER informed, in a timely manner, about any change in location, price or specifications of the VESSEL.

    B. To refer immediately to the BROKER all inquiries or offers received from other brokers or parties interested in purchasing the VESSEL.

    C. To enter into the customary written purchase agreement in the event the BROKER or one of the cooperating brokers finds a satisfactory purchaser.

    D. That upon the sale, exchange, trade or donation of the VESSEL, or if it is otherwise transferred or conveyed,

during the term of this Central Agency Agreement, the OWNER shall pay to the BROKER, a commission of ten percent (10%) of the gross sales price of the VESSEL or ___n/a___ whichever is greater. The OWNER further agrees to pay the same commission if, within one (1) year from the date of termination of this agreement, the VESSEL is sold, exchanged, traded, donated or otherwise conveyed to anyone to whom the BROKER or any other cooperating broker submitted the VESSEL during the term of this agreement.

E. That permission is hereby given by the OWNER to the BROKER to advertise the VESSEL, to place the BROKER'S sign on the VESSEL, to distribute information describing the VESSEL to its clients and to cooperating brokers and to go aboard the VESSEL with potential buyers to exhibit and operate the VESSEL to the satisfaction of the potential buyer, his agent and his surveyor.

F. To maintain full and complete insurance coverage (both hull and public liability) on the VESSEL during the term of this agreement and to obtain approval from the OWNER'S insurance underwriter to allow the BROKER to exhibit and operate the VESSEL, on behalf of the OWNER, to potential buyers and cooperating brokers.

G. That it is specifically understood and agreed that the BROKER does not assume and is not delegated by the OWNER, care, custody and control of or responsibility for the VESSEL at any time during the term of this agreement and the OWNER further agrees not to hold the BROKER, or any cooperating broker, liable for any loss or damage to the VESSEL and its equipment or injury to any person from any cause whatsoever during the term of this agreement.

5. This Central Agency Agreement shall remain in full force and effect for a minimum period of 6 MONTHS and shall continue thereafter until the VESSEL is sold or until this AGREEMENT is cancelled by either party with written notice to the other, to be effective 30 days after receipt.

6. This agreement is binding on the BROKER and OWNER(s), their heirs, executors, successors, administrators and assigns.

In point of error one, appellant challenges the trial court's legal conclusion that appellee was entitled to a commission under its contract with appellant. Appellant contends that the contract was an exclusive agency agreement which would require appellee to be the producing cause of the sale in order to recover any commission. Since it was undisputed that appellee did not procure the sale in this case, appellant contends no commission is due appellee. We disagree.

■ Appellant attempts to hide behind the distinction between an exclusive right to sell and an exclusive agency agreement to support his argument that appellant had no obligation on this contract even though the contract was still in force. It is not necessary, however, to decide whether the contract was an exclusive agency or exclusive right to sell contract. Even if the contract was an exclusive agency agreement, as appellant contends, this would not give appellant the right to appoint another agent and avoid paying appellee any commission due under its contract. Under an exclusive agency, appellant may have been able to avoid paying a commission if he sold the vessel directly or through his regular employees, but not through another agent, as in this case. *See Browning v. Johnson*, 729 S.W.2d 331, 335 (Tex.App.— Dallas 1987, writ ref'd n.r.e.); *also see Alba Tool and Supply Company, Inc. v. Industrial Contractors*, 585 S.W.2d 662, 664 (Tex.1979) ("In an exclusive agency, *the principal* has a right to sell without the payment of a commission to the agent."). It is undisputed that appellant had Farr International sell the vessel to an interested buyer, without telling appellee. This was in direct breach of the contract which provided that the owner "refer immediately to [appellee] all inquiries or offers from other brokers or parties interest-

ed in purchasing the VESSEL." Appellee was entitled to a commission pursuant to the clear provisions of 4(D) of the contract. *See Browning, supra,* 729 S.W.2d at 335 (developer who entered second exclusive agency contract during period of first contract required to pay mortgage broker commission from first contract even though second firm procured the commitment). Appellant's point of error one is overruled.

■ In appellant's second point of error, appellant contends that the trial court erred in awarding $7,400 to appellee because that amount placed appellee in a better position than he would have been had the contract been performed. Appellant cites language from *McDonald v. Davis,* 389 S.W.2d 494, 497 (Tex.Civ.App.—Houston 1965, no writ) to support his proposition that when a principal breaches a brokerage contract and becomes liable, the broker is only entitled "to recover the reasonable profit he would have made". What appellant fails to cite is the sentence which directly follows that language: "Prima facie that profit is the amount represented by the stipulated commission." *Id.* (*citing Park v. Swartz,* 110 Tex. 564, 222 S.W. 156 (Tex.1920)). The stipulated commission in the contract in the present case was 10%. Further, in *Davis, supra,* this court went on to cite a Supreme Court case that stated the reason why a party should not be able to complain about paying the contract commission is because the other party was prevented the right to perform under the contract. *Id.* 389 S.W.2d at 498.

Appellant argues that if the contract had been performed, appellant would have contacted appellee about Farr International's prospective buyer, appellee and Farr would have cooperated on the sale, and then they would have shared a 30/70 split on the brokerage fee since a 30/70 split is common in the industry. Appellant concludes, therefore, that appellee was only entitled to 30% of the brokerage fee. We disagree with this analysis. First, there was conflicting testimony as to what was the "industry standard split" for this type contract; it was not clear that it would be a 30/70 split. Second, the contract provides that appellee pay cooperating brokers their portion of the commission, but does not state the amount. If the contract had been properly performed, appellant would have paid appellee the full 10% commission, and then, if there was a "cooperating broker", appellee and not appellant would have been the responsible party under the contract to pay the appropriate portion to the cooperating broker. If there was merit to appellant's argument concerning the 30/70 split, appellant should have filed an interpleader action, which he did not do in this case. Appellant cannot complain of paying a commission twice because of his own failure in seeking the proper legal remedy. *See Dallas Bank & Trust Co. v. Commonwealth Development Corp.,* 686 S.W.2d 226, 230 (Tex.App.—Dallas 1984, writ ref'd n.r.e.) ("purpose of interpleader procedure is to relieve innocent stakeholder of the vexation and expense of multiple litigation and the risk of multiple liability."). Appellant's point of error two is overruled.

■ In point of error three, appellant contends the trial court erred because there was no evidence to support the finding that appellant promised to pay appellee a 10% commission when the vessel was sold. In reviewing the record for legal sufficiency, we are to consider only the evidence and inferences that tend to support the court's finding and disregard evidence and inferences to the contrary. *Sherman v. First National Bank in Center, Texas,* 760 S.W.2d 240, 242 (Tex.1988). If there is any evidence of probative value to support the finding, we must uphold the finding. *Id.; In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (Tex.1951). The evidence supporting the court's finding that appellant promised to pay appellee 10% is shown in the clear language of the contract. There is no dispute that appellant hired and paid a broker other than appellee without terminating his contract with appellee by written notice as required by the contract. There also is no dispute that appellant sold the vessel for $74,000 and 10% of that amount would be $7,400. We therefore find there was evidence of probative value to support the trial court's specific findings on these issues. Appellant's point of error three is overruled.

In point of error four, appellant contends the trial court erred in holding that appellee was entitled to recover attorney's fees because appellee's demand under the breach of contract was excessive. Appellant does not argue that the attorney fees themselves are not reasonable. Appellant argues that the 10% commission awarded to appellee was not a valid claim and that TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986) only allows reasonable attorney's fees from a *valid* claim. Appellant contends that 3% was all appellee was entitled to under it's shared brokerage fee idea. Nevertheless, as discussed above in reviewing point of error two, we find no merit in this argument. The 10% commission was provided for in the contract and was the valid claim for which appellee sued. Accordingly, the attorney's fees were awarded in addition to a valid claim. Appellee is entitled to recovery of attorney's fees pursuant to 38.001 of TEX.CIV. PRAC. & REM.CODE ANN. *See Lyons v. Montgomery,* 701 S.W.2d 641, 644 (Tex.1985) (allowed recovery of reasonable attorney fees from claim founded on a written contract). Appellant's point of error four is overruled.

Accordingly, the trial court's judgment is affirmed.