**Opinion issued October 22, 2013**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00189-CV

_____

**BETH BRYANT, ATASCOCITA UNITED METHODIST CHURCH AND THE WEEKDAY LEARNING CENTER, Appellants**

**V.**

**S.A.S. AND L.O.S., INDIVIDUALLY AND AS NEXT FRIENDS OF E.R.S. AND E.L.S., THEIR MINOR CHILDREN, Appellees**

_____

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-41141**

_____

## DISSENTING OPINION

In taking from appellees, the Plaintiff-Children (the "Children") and Plaintiff-Parents (the "Parents"), their lawfully awarded damages, the majority substitutes its judgment in place of that of the jury below, does not apply the well-

settled standard for reviewing the legal sufficiency of the evidence, and misapplies the governing law. Accordingly, I respectfully dissent.

The majority holds that "no evidence" supports the jury's findings that the following violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") constituted a "producing cause"[1] of the damages of the Children and Parents, for the rape and sexual molestation of the Children: (1) the false, misleading, or deceptive acts or practices[2] of appellants, Beth Bryant and the Atascocita United Methodist Church and the Weekday Learning Center (collectively, the "WLC"), (2) Beth's failure to disclose information, of which she was aware, about Morgan Bryant, her psychologically-disturbed teenage son, to induce the Parents to hire Morgan to babysit the Children,[3] and (3) Beth's engagement in an unconscionable action or course of action.[4]

However, the Parents testified, directly and clearly, that they simply would not have hired Morgan Bryant to babysit their Children, their three- and five-year-old sons, but for the representations of Beth Bryant and WLC that he had sponsorship, approval, status or connection, which he did not have, and his baby-

---

[1]    *See* TEX. BUS. & COM. CODE ANN. § 17.50(a)(1) (Vernon 2011).

[2]    *See id.* at § 17.46(b)(5) (Vernon 2011).

[3]    *See id*. at § 17.46(b)(24).

[4]    *See id*. at § 17.50(a)(3).

2

sitting services would be of a particular standard, quality or grade, of which they were not. They also explicitly explained that they would not have hired Morgan had Beth disclosed to them information about his serious psychological problems.

From the Parents' testimony and the other record evidence, the jury could have reasonably concluded that Beth Bryant and WLC did themselves endanger the Children and cause their and their Parents' damages by promoting the psychologically-disturbed Morgan Bryant as a babysitter and misrepresenting his qualifications to babysit. And it could have further reasonably concluded that Beth's withholding from the Parents of critical information about Morgan's disturbed psychological condition constituted an unconscionable action and caused the Children and Parents' damages.

### Standard of Review

In gauging whether a trial judge has erred in making a legal ruling or a jury has made an erroneous finding of fact, a reviewing court must apply the pertinent appellate standards of review. These well-settled appellate standards "frame the issues, define the depth of review, assign power among judicial actors, and declare the proper materials to review." W. Wendell Hall, *Standards of Review in Texas*, 34 ST.MARY'S L.J. 1, 8 (2002) (quoting Steven A. Childress, *Standards of Review in Federal Appeals,* in UNIV. OF TEX. 2ND ANNUAL CONF. ON TECHNIQUES FOR HANDLING CIVIL APPEALS IN STATE AND FEDERAL

COURT 4 (1992)). Standards of review are, in effect, checks on an appellate court's legitimate use of power because adherence to them restrains, in a very real way, the actions of the appellate court. As noted by Hall, "[s]tandards of review distribute power within the judicial branch by defining the relationship between trial and appellate courts." *Id.*

We must sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, a "court must consider [the] evidence in the light most favorable to the verdict, and indulge every reasonable *inference* that would support it." *Id.* at 822 (emphasis added). The term "inference" means,

> in the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved . . . .

*Marshall Field Stores, Inc. v. Gardiner,* 859 S.W.2d 391, 400 (Tex. App.— Houston [1st Dist.] 1993, writ dism'd w.o.j.) (citing BLACK'S LAW

4

DICTIONARY 700 (5th ed. 1979)). For a jury to infer a fact, "it must be able to deduce that fact as a logical consequence from other proven facts." *Id.*

We must overrule a legal-sufficiency or "no-evidence" challenge if there is more than a scintilla of evidence to support the challenged finding. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998). "'[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983)). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller,* 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller,* 168 S.W.3d at 822.

## Background

Morgan Bryant was a disturbed and troubled teenager, and it is not hard to understand why his mother tried to help him secure employment through her position and contacts at WLC. But the jury heard evidence that Beth Bryant and WLC crossed the line when, in actively promoting him to the parents and children

5

who employed them, they misrepresented Morgan's work experience in dealing with children at WLC to act as a "POSSIBLE BABYSITTER AT YOUR SERVICE" and "Great companion for your 'boys'!" This is especially true, given that Beth was well aware of his troubled psychological condition.

Beth Bryant knew that her son had psychological problems as early as when he was in the eighth grade and diagnosed with, and prescribed medication for, attention deficit disorder, an ongoing concern with him. She also knew that Morgan Bryant had admitted to being "addicted" to pornography. As acknowledged by the majority, between Morgan's freshman and junior years of high school, Beth and her husband caught him viewing pornography on the internet, and they admonished him to stop. But, after they had installed an internet filter on Morgan's computer to stop him from doing so, he was still able to, and continued to, view pornography.

Beth Bryant also knew that Morgan, due to his being overweight and teased by other teenagers, had, in his sophomore year in high school, serious "self-esteem" issues, for which he sought psychological counseling. And, in December 2007, she was aware that Morgan was having crying spells and his psychological condition had deteriorated to the point that a psychiatrist diagnosed him with depression and prescribed him antidepressant drugs. Morgan's depression was

6

such that he underwent clinical testing and received regular psychological counseling.

Despite her awareness of this information about her son, Beth Bryant consciously chose to use her employment at WLC to help him secure babysitter jobs. And WLC obliged her. Near the end of 2007, Beth drafted the flyer quoted in the majority opinion for distribution to the parents of the children who attended WLC. She targeted the advertisement to parents who "[n]eed[ed] someone while WLC is on break for the Holidays," noting that Morgan Bryant was a "POSSIBLE BABYSITTER AT YOUR SERVICE" and would be a "Great companion for your 'boys'!"

More important, Beth Bryant represented in her advertisement that Morgan Bryant had been previously employed by WLC, listing his experience with working with children as:

Part-Time WLC Summer School Help

WLC Vacation Bible School Worker

These representations were false. Morgan had not worked at WLC at any time prior to Beth's distribution of the advertisement, and he did not even apply for employment at WLC until February 2008. And, as WLC concedes in its briefing, Beth testified to the jury that she actually made the representations that Morgan had worked at WLC in her advertisement in reference "to Morgan's upcoming

7

employment with the school the next summer," in 2008. WLC later admitted that Morgan had worked there "one day and one day only" in June 2008.

Disregarding the undisputed fact that Morgan had not worked with children at WLC, Beth Bryant, in accord with WLC policy, submitted the flyer containing the misrepresentations for approval and distribution at WLC to Beth Johnson. Johnson, WLC's director, testified that she read the flyer and approved it for distribution by Beth in WLC student backpacks just prior to the 2007 holiday season. In exchange for its approval for the distribution of the flyer, WLC obtained $20.00.

In early January 2008, the Parents received a copy of Beth Bryant's WLC-approved flyer in the backpack of their three-year old son. A few days later, Beth personally gave the Plaintiff-Mother a copy of the flyer at WLC and stated, "Morgan babysits," despite the fact that he had never before babysat.

Both Parents testified that they decided to hire Morgan Bryant in late January 2008 to babysit their three- and five-year old sons based on the representations in the advertisement about his qualifications as including "Part-time WLC Summer School Help" and "WLC Vacation Bible School Worker." Because the flyer had been approved by WLC and placed in their son's backpack by a WLC employee, the Parents trusted that the representations made about Morgan's work qualifications were true and WLC's teachers and staff had in fact

8

worked with him, vetted him by observing his interaction with children at WLC, and trained him.

Morgan Bryant babysat the Children on five to ten occasions from late January through May 2008. On June 7, 2008, the younger child made an outcry about the rapes and sexual molestations that had been occurring the previous months. Over the months, Morgan had exposed his penis to the three- and five-year old boys and fondled both of their penises. And he had masturbated in front of them, telling them that he was playing a game to make his "man's milk" come out. And Morgan had forced the five-year old to take Morgan's penis into his mouth, stating, "If you suck on it, it will come out faster."

The Parents learned specifically that their Children had been raped and sexually abused after their three-year old mentioned that Morgan Bryant had "pee-peed on the couch." The five-year old then corrected the younger child, stating it was "man's milk," not urine. He then imitated how Morgan had masturbated, gyrating his hips and making a masturbatory gesture with his hand. The Plaintiff-Father then contacted law-enforcement authorities, who subsequently arrested Morgan. And Morgan later confessed that he began raping and molesting the Children in March 2008, and he continued to do so in April and May.

In question one of its charge, the trial court asked the jury whether Beth Bryant and WLC had engaged in "any false, misleading, or deceptive act or

practice that was a producing cause of damages" to the Children and their Parents, and the jury answered "yes" as to both. In response to questions two and three, the jury found that Beth had "fail[ed] to disclose information about services that was known at the time of the transaction with the intention to induce" the Parents "into a transaction they otherwise would not have entered into if the information had been disclosed," she had "engag[ed] in an unconscionable action or course of action," and her actions constituted a "producing cause" of damages to the plaintiffs. In answer to question four, predicated on a yes answer to question one, the jury found that both Beth and WLC had "knowingly" engaged in their conduct and Beth had also "intentionally" engaged in her conduct. In answer to questions five and six, predicated on yes answers to questions two and three, the jury further found that Beth had "knowingly" and "intentionally" failed to disclose information to the Parents and had engaged in an unconscionable action or course of action. And the jury found that Beth, "when she prepared and/or sent the flyer in question," was "acting as an employee of WLC" and "in the scope of her employment in furtherance of the business" of WLC.

**Producing Cause of Damages**

In their second issue, Beth Bryant and WLC contend that the evidence is legally insufficient to support the jury's findings that their false, misleading, or deceptive acts or practices, Beth's failure to disclose information, and her

10

unconscionable actions or course of action, were a "producing cause" of damages to the Children and Parents. WLC asserts that "[n]o business, no person should be faulted for failing to disclose information they do not have, or for misrepresentations which did not play a substantial role in causing the crime at issue." Beth asserts that her "circulation of a flyer advertising her son's availability for babysitting *merely* resulted in Morgan Bryant being in the Plaintiff's house where Morgan Bryant had the opportunity to molest the Plaintiff Children." (Emphasis added.)

Under the DTPA, a consumer may maintain an action where, among other acts, any of the deceptive practices listed in section 17.46(b) of the DTPA, or an unconscionable action or course of action, "constitute a *producing cause* of economic damages or damages for mental anguish . . . ." TEX. BUS. & COM. CODE ANN. § 17.50(a) (emphasis added). To establish a DTPA violation, a plaintiff does not have to meet the higher standard of proximate causation, which includes foreseeability as an element; "only [a] producing cause must be shown." *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex. 1995). But, the element "common to both proximate cause and producing cause is actual causation in fact," which "requires proof that an act or omission was a *substantial factor* in bringing about injury which would not otherwise have occurred." *Id.* (emphasis added). Thus, "producing cause and cause in fact are

11

conceptually identical." *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 223 (Tex. 2010).

However, as emphasized by the Texas Supreme Court, the "substantial factor" language "*does not demand, nor even imply*, a higher standard of legal causation beyond the ordinary sense of the concept," and it "serves only to illustrate an essential aspect of causation to jurors . . . ." *Id.* at 224 (emphasis added). As explained by the supreme court:

> The word "substantial" is used to denote the fact that the defendant's conduct has *such an effect in producing the harm as to lead reasonable men to regard it as a cause*, using that word *in the popular sense, in which there always lurks the idea of responsibility*, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called "philosophic sense," yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.

*Id.* (quoting *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 472 & n.1 (Tex. 1991) (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965)) (emphasis added). In other words:

> [F]or an act or event to rise to the level of cause in the legal sense, the act or event must be such that reasonable jurors would identify it *as being actually responsible* for the ultimate harm. *The cause must be more than one of the countless ubiquitous and insignificant causes that in some remote sense may have contributed to a given effect as, for example, simply getting up in the morning.* That the term substantial factor is given to this commonsense aspect of legal causation simply makes plain to jurors that more than causation in this indirect, "philosophic sense" is required.

12

*Id.* at 224.  In short, the substantial factor language merely repeats "something already included in the usual and ordinary meaning of 'cause' and draws juror attention to the importance of an unbroken causal connection."  *Id*. (quoting *Texas Indem. Ins. Co. v. Staggs*, 134 S.W.2d 1026, 1030 (Tex. Com. App. 1940)).

In accord with the governing law, the trial court, in questions one, two, and three of if its charge, instructed the jury as follows:

> "Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred.  There may be more than one producing cause.

As illustrated above, the Children and Parents presented ample evidence from which the jury could have reasonably inferred that Beth Bryant and WLC's false, misleading, or deceptive acts or practices, Beth's failure to disclose critical information about Morgan Bryant to the Parents, and her unconscionable actions constituted producing causes of their damages.

The jury heard evidence that Beth Bryant, as an employee of WLC and acting within the scope of her employment, and WLC actively promoted Morgan Bryant to the parents and children who utilized WLC's services.  And they misrepresented Morgan's experience in working with children at WLC to act as a "BABYSITTER AT YOUR SERVICE" and "Great companion for your 'boys'!"

13

The Children and Parents also presented undisputed evidence that Beth Bryant was well aware of her son's troubled psychological condition, although she presented conflicting evidence as to the meaning and extent of his troubles. The jury could have reasonably rejected Beth's evidence and concluded that no reasonable and prudent parent would have ever considered hiring Morgan Bryant to babysit a three- or five-year old child if they had information that he was being medicated for attention deficit disorder, was "addicted" to pornography, or was being counseled and medicated for depression. Why not? Because, given the serious nature of Morgan's psychological problems, one would be placing the life of one's child into a very volatile and dangerous situation.

Again, the record evidence shows that Beth Bryant knew that her son had had psychological problems since he was in the eighth grade and was diagnosed with, and prescribed medication for, attention deficit disorder. Morgan Bryant had admitted to Beth and her husband that he was "addicted" to pornography, and although they had installed an internet filter on his computer to stop him, he worked his way around it and continued to view pornography. Beth also knew that Morgan, due to his being overweight and teased by other teenagers, had, in his sophomore year in high school, serious "self-esteem" issues, for which he obtained psychological counseling. And, in December 2007, one month before promoting his babysitting services to the Plaintiff-Mother, Beth was aware that Morgan was

14

having crying spells and his psychological condition had deteriorated to the point that a psychiatrist diagnosed him with depression and prescribed him antidepressant drugs.

Moreover, Beth Bryant, the jury found, intentionally and knowingly chose to use her employment at WLC to help Morgan Bryant secure babysitter jobs. She drafted the flyer quoted in the majority opinion for distribution to the parents of the children who attended WLC, promoting Morgan as a "POSSIBLE BABYSITTER AT YOUR SERVICE" and "Great companion for your 'boys'!" And she represented in her advertisement that Morgan had been previously employed by WLC, listing his experience with working with children as:

Part-Time WLC Summer School Help

WLC Vacation Bible School Worker

In fact, Morgan Bryant had not worked at WLC at any time prior to Beth Bryant's distribution of the advertisement, and he did not apply for a job there until February 2008, after the Parents had hired him. Again, as WLC concedes in its briefing, Beth, testified to the jury that she actually made the representations that Morgan had worked at WLC in her advertisement in reference "to Morgan's upcoming employment with the school the next summer" in 2008. And WLC later admitted that Morgan worked there "one day and one day only" in June 2008.

15

Finally, Beth Bryant, in accord with WLC policy, submitted the flyer containing the misrepresentations for approval for distribution at WLC to Beth Johnson. And Johnson, WLC's director, testified that she read the flyer and approved it for distribution by Beth Bryant in WLC student backpacks. In exchange for its approval for the distribution of the flyer, WLC made $20.00. Thus, the jury could have reasonably inferred that WLC, through both Beth Bryant and Beth Johnson, knowingly engaged in a false, misleading or deceptive act or practice.

In sum, the Parents hired Morgan Bryant to babysit their three- and five-year old children, a position of *ultimate* responsibility, trust, and confidence. They hired him to watch over their children and protect them from danger and dangerous individuals. They, quite literally, placed their children's lives into the hands of Morgan. And the jury heard evidence that they did so based upon Beth Bryant and WLC's false, misleading, and deceptive acts and practices, Beth's failure to disclose critical information, of which she was aware, about Morgan, and her unconscionable actions and course of action. These deceptive acts and practices concerned the very nature of the function and role of Morgan as a babysitter.

But for the false, misleading, and deceptive acts and practices of Beth Bryant and WLC, Beth's failure to disclose to the Parents information about Morgan Bryant's disturbed psychological condition, and her unconscionable

16

actions and course of action, the Children would not have been placed into the safekeeping of one such as Morgan to be their trusted babysitter. The jury could have logically deduced that each of these deceptive acts and practices constituted a "substantial factor" in bringing about the damages of the Children and Parents and without which the damages would not have been incurred. *See Marshall Field Stores, Inc.,* 859 S.W.2d at 400 (stating that for jury to infer fact, "it must be able to deduce that fact as a logical consequence from other proven facts.").

In other words, the jury could have reasonably concluded that Beth Bryant and WLC's deceptive conduct had "such an effect in producing the harm" to the Parents and Children "as to lead reasonable men" and women "to regard it as a cause, using that word in *the popular se*nse, in which there always lurks the idea of *responsibility*." *Crump*, 330 S.W.3d at 224 (quoting *Lear Siegler, Inc.* 819 S.W.2d at 472 & n. 1 (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965)) (emphasis added). That is, the jury could reasonably have identified the deceptive actions and practices of Beth and WLC "as being actually responsible for the ultimate harm," and not just "one of the countless ubiquitous and insignificant causes that in some remote sense may have contributed to a given effect as, for example, simply getting up in the morning." *Id.* Thus, the evidence is legally sufficient to support the jury's findings that Beth Bryant and WLC's false, misleading, and deceptive acts and practices, Beth's failure to disclose critical

17

information to the Parent's about Morgan Bryant, and her unconscionable actions and course of action each constituted a "producing cause" of damages to the Children and Parents.

In support of their position to the contrary, Beth Bryant and WLC rely on *Doe v. Boys Club of Greater Dallas, Inc*., 907 S.W.2d 472 (Tex. 1995). WLC asserts that "*Doe* is on point, dispositive," and "require[s] this Court to reverse and render the judgment and rule that the [Children and Parents] take nothing. *No other result is remotely fair*." (Emphasis added.) The majority agrees.

Based on its interpretation of *Doe* and the record evidence, the majority opines that the causal connection between the deceptive acts and practices of Beth Bryant and WLC and the damages incurred by the Children and Parents was broken because "the relationship between Morgan [Bryant] and [the Children and Parents] *developed independently* of [Beth] and [WLC]." (Emphasis added.) Although the majority acknowledges that Beth's "flyer and . . . comment led the [Parents] to offer a job to Morgan to babysit their children," it asserts that the rape and sexual molestation of the three- and five year old boys "began two months later" and, '[b]y then, the [Parents] had hired Morgan at least two other times . . . [w]ithout any prompting from, or remuneration to [Beth] or [WLC] . . . ." It concludes, thus,

> By the time of the abuse, the connection between the representations
> in the flyer and Morgan's presence in the Smith's home was too

18

attenuated to cause the Smiths' injuries—as in *Doe*, the misrepresentations in the flyer created a condition that later made the grievous injuries possible—it was not a producing cause of them.

The majority's conclusion is wrong because it is based on two false premises: (1) the Children and their Parents had some kind of "relationship" with Morgan Bryant independent and separate from his position as a paid babysitter and (2) *Doe* justifies its holding.

First, there is no evidence in the record that the Children and the Parents had any so-called "relationship" whatsoever with Morgan Bryant outside of the Parent's hiring of him to be a babysitter. In fact, the Children and Parents presented evidence to the contrary. The record evidence is clear that the Parents were reluctant to hire Morgan in the first place after initially meeting him, and they continued to have misgivings about his abilities in the short time that they knew him. However, they, trusting and relying on the misrepresentations of Beth Bryant and WLC about his experience with children and babysitting, overcame their reluctance and misgivings. The jury could have reasonably deduced, thus, that the only "relationship" that the Children and the Parents had with Beth Bryant's son was based entirely on Beth and WLC's deceit. And neither Beth nor WLC presented conclusive evidence to the contrary.

Second, contrary to WLC's assertion, *Doe* is not on point, not dispositive, and does not require this Court to reverse and render judgment that the Children

19

and Parents "take nothing."  Rather, *Doe* serves as a contrasting example of how strong of a case the Children and Parents have against Beth Bryant and WLC.

In *Doe*, Boyd Mullins, on community supervision for the offense of driving while intoxicated, performed sixty hours of community service for the Boys Club from March through September 1986, and he continued to volunteer there through the summer of 1987.  907 S.W.2d at 475.  Mullens met two of the minor plaintiffs, who had joined the Boys Club, at the Boys Club in the summer of 1986, and one minor plaintiff, who joined the Boys Club the following summer.  *Id*.  As noted by the Texas Supreme Court, Mullens "took them and their friends on various outings *not sponsored by the Boys Club*."  *Id*. (emphasis added).  And during the years, "Mullens also became a trusted acquaintance and family friend of the three boys' grandparents, Mr. and Mrs. Coe, and a common visitor in their home."  *Id*.

Specifically, although the Coe brothers "became acquainted with Mullens" at the Boys Club, "he also visited Mr. and Mrs. Coe in their home up to ten times," and, later in the summer of 1986, "proposed taking the brothers on a camping trip." *Id*. at 476.  When Mrs. Coe then asked the Boys Club's education director about Mullens, he "emphasized that with regard to letting Mullens take the boys camping, 'The Boys Club couldn't make that choice for her. *She needed to make that decision for herself*.'" *Id*. (emphasis added).  Mr. and Mrs. Coe then gave their permission for Mullens to take A. C. and R. M. Coe on the overnight camping

20

trip. *Id.* On the trip, after Mullens gave the two boys cigarettes, he sexually abused A. C. Coe. *Id.* In the fall of 1986, he sexually abused R. M. Coe while on a fishing trip. *Id.* And Mullens "continued to be a regular guest in the Coe home through 1988, and spent the night on many occasions." *Id.*

The following summer, the Coe brothers' cousin, C. G. Doe, joined the Boys Club while he was spending the summer with Mr. and Mrs. Coe, his grandparents. *Id.* And Mullens met C. G. Doe at the Boys Club through the Coe brothers. *Id.* He first sexually abused C. G. Doe "on a second private camping trip taken alone with the three boys later the summer of 1987." *Id.*

Doe and the Coes then asserted a DTPA claim against the Boys Club based in part on the Boys Club's representation to Mrs. Coe, made before A. C. and R. M. Coe joined, that the Boy's Club "thoroughly" "checked out" its volunteers before allowing them to work with members. *Id.* at 481. The supreme court held that summary judgment against the plaintiff's on this claim was proper because, "*Given the long-term relationship Mullens fostered with Mr. and Mrs. Coe*, the Boys Club's statement about investigating volunteers was not the producing cause of the boys' injuries. It at most furnished an attenuated condition that made the injury possible." *Id.* at 481–82 (emphasis added). In so holding, the court emphasized that:

21

The events were as follows: the Coe brothers joined the club, they met Mullens, Mullens met Mr. and Mrs. Coe, and Mullens *methodically proceeded to inveigle these grandparents into giving him their trust and confidence*. He visited the Coe home almost every weekend the latter part of the summer of 1986, and visited even more, including weekday visits, the summer of 1987. The Coes let Mullens take the boys to lunch and to play "putt putt" golf within weeks of meeting him. According to A. C. Coe, *Mullens actively deceived the Coes into placing their grandsons alone in his care*. On at least ten visits to the Coes' home prior to the first camping trip, Mullens:

> Just sat there and talked to my grandparents and got to know them and stuff.... they would talk about child abuse and stuff and how he hated it ... and [was] highly against drinking and doing drugs ... he was real innocent and everything, [like] he didn't do nothing like that....

Common sense tells us that *the relationship between Mr. and Mrs. Coe and Mullens developed independently of the Boys Club's relationship with the Coes*. When Mrs. Coe returned to the Boys Club to inquire about Mullens, *the club's education director emphasized, "The Boys Club couldn't make that choice for her," and, "She needed to make that decision for herself"* whether to put her grandsons in Mullens's care.

*Id*. at 481 (emphasis added).

Given that (1) Mullens "fostered" a "long-term relationship" with Mr. and Mrs. Coe "independent" of his involvement with the Boys Club and (2) the Boys Club's education director told Mrs. Coe that it was her "decision" as to whether to allow Mullens to take the boys on a private camping trip, the Boys Club established, as a matter of law, that any statement it made to Mrs. Coe was "not a producing cause of the boys' injuries." *Id*. at 481-82.

22

Here, in stark contrast to *Doe*, Beth Bryant and WLC did not present conclusive evidence that their deceptive acts and practices merely "furnished an attenuated condition that made" the Children and Parent's injuries "possible." Morgan did go to the Children's home, but only in the context of babysitting them. There is no evidence that Morgan Bryant, himself, "*methodically proceeded to inveigle*" the Parents into giving him their trust and confidence or in any way developed a relationship with the Parents independent and apart from his services as a babysitter. Rather, the evidence reveals that the Parents' trust and confidence was procured through the deceptive acts and practices of Beth Bryant and WLC. Nor did Morgan have any "relationship" with the three- and five-year old Children apart from raping and molesting them while he was supposed to be babysitting them.

From the record evidence, the jury could have logically deduced that the extent of any so-called "relationship" Morgan had with the Children and their Parents was based solely on his employment as a babysitter, which in turn was obtained through the deceptive actions of Beth Bryant and WLC. Accordingly, I would hold that the evidence is legally sufficient to support the jury's findings that Beth and WLC's false, misleading, and deceptive acts and practices, Beth's failure to disclose information about Morgan Bryant's psychological troubles, and her unconscionable actions or course of action, were each a "producing cause" of

23

damages to the Children and Parents. And I would address the remaining issues and the Children and Parents' cross-appeal.

In reaching its contrary holding, the majority merely substitutes its judgment in place of that of the jury, does not follow the well-settled legal-sufficiency standard of review, and misapplies *Doe*.

## Conclusion

Justice Felix Frankfurter observed that, "[a] timid judge, like a biased judge, is intrinsically a lawless judge." *Wilkerson v. McCarthy*, 336 U.S. 53, 65, 69 S. Ct. 413, 419 (1949) (Frankfurter, J., concurring). He made this comment in emphasizing that a judge "fails in his duty to take a case from the jury when the evidence would not warrant a verdict by it." *Id.* To make a civil defendant pay damages to a plaintiff when there is no evidence to support the defendant's liability or the plaintiff's damages is indeed a "lawless" act. However, it is just as "lawless" for a judge to take from a plaintiff a just damages award based on a jury verdict supported by sufficient evidence.

As demonstrated here, the review of the evidence in a case for legal sufficiency is probably the most important task of any judge. Judges, in performing this critical function, have two helpful guides to follow: (1) a standard of review and (2) the basic rules of logic. However, it is a sad fact that courts sometimes fail in performing this task and end up merely substituting their

24

judgment for that of a jury. As Goethe noted long ago, "error has plenty of room to wander round and to hold sway."[5] Unfortunately, in regard to the legal-sufficiency review of evidence in courts, this is especially true. And, as this case reveals, such an error can have disastrous consequences not only for the litigants involved, but for the state's jurisprudence. Thus, this Court's error is of such importance to Texas jurisprudence that it should be corrected by our high court. *See* TEX. GOV'T CODE ANN. § 22.001(a)(6) (Vernon 2004).

Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

---

[5] JOHANN WOLFGANG VON GOETHE, *Maxims and Reflections*, p. 158 (Penguin Books 1998).