

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-14-00303-CV

TITAN OPERATING, LLC                                                                          APPELLANT

V.

MARCUS C. MARSDEN, JR. AND                                                          APPELLEES
LAURA B. MARSDEN

----------

FROM THE 415TH DISTRICT COURT OF PARKER COUNTY
TRIAL COURT NO. CV11-0842

----------

## MEMORANDUM OPINION[1]

----------

In one issue, appellant Titan Operating, LLC (Titan) appeals the trial court's money judgment in favor of appellees Marcus C. Marsden, Jr. and Laura B. Marsden. Titan contends that as a matter of law, quasi-estoppel principles preclude the Marsdens from negotiating and signing an oil and gas lease,

---

[1]*See* Tex. R. App. P. 47.4.

accepting benefits under that lease and under a related transaction, and later maintaining a nuisance suit against Titan for acts that the lease and the related transaction contemplated or authorized. We agree with Titan's position, and we therefore reverse the trial court's judgment and render a judgment that the Marsdens take nothing.

## Background Facts

The Marsdens have lived at a home near Aledo since 1997. Before they moved there, Marcus attended law school and practiced law in El Paso. He continued practicing law upon moving to Aledo, including researching legal matters related to title opinions sought by oil and gas companies. The Marsdens have two daughters. They purchased their 6.2-acre property so that they could live close to Marcus's parents and raise horses. For the first several years that they lived there, their home was in a rural, quiet, and exclusively residential area.[2]

The Marsdens' home is toward the northwest side of their property, and they have a barn and a horse shelter to the east of the home on the north edge of the property. The majority of the land that they own is to the east and south of the home, and the land is bordered on its south and east sides by roads. These roads intersect at the southeast corner of the property.

---

[2]Marcus admitted, however, that at the time of the trial in June 2014, it was "not rare" to find an oil and gas pad site in the area near his property.

In 2004, Tony Lucido, a representative from Hollis R. Sullivan, Inc. (Sullivan), approached the Marsdens to discuss the possibility of their execution of an oil, gas, and mineral lease. Marcus understood that Sullivan planned on drilling a well "in the area and they were dealing with Norma Miller, who was a large landowner in and around the properties" on a road that abuts the Marsdens' property. He also understood that the company was in the process of negotiating leases with other nearby landowners.

Miller owned land adjoining the north and south boundaries of the Marsdens' property. Marcus expressed concern about the potential drilling location and was told that the wells would be drilled "somewhere on [Miller's] property," which spanned almost fifty acres.

The Marsdens signed the lease with Sullivan in September 2004 and received a per-acre bonus for doing so. The lease recited that in exchange for $10 "in hand paid" and certain royalties to be paid from production,[3] the Marsdens granted Sullivan rights to explore, prospect, drill, and mine for oil and gas, including by "injecting gas, water[,] . . . other fluids, and air into subsurface strata[;] laying pipe lines[;] [and] building roads, tanks, power stations, telephone lines, and other structures." A provision of the lease stated that "no well [could] be drilled within two hundred (200) feet of any residence or barn" on the

---

[3]Marcus testified, "I get 25 percent of my minerals, [Titan gets] 75 percent of [the] minerals." The lease states that the Marsdens are entitled to payment for one-fifth of the amount realized from the sale of gas produced from their land.

Marsdens' land without their consent.[4] Another provision allowed either party to assign its rights under the lease. The lease included an addendum that was negotiated[5] and executed by the Marsdens and by Sullivan and that contained the following provisions:

> 1. [The Marsdens] and [Sullivan] agree that no drilling or other activities will be conducted upon the surface of [the Marsdens' property] and that no roads, pipelines, tanks, heaters, separators, injection wells, or other surface equipment will be placed on [the Marsdens' property] without the prior, written consent of [the Marsdens.][6] *[B]ut [Sullivan] shall have the right to prospect, drill, and produce oil and gas from beneath the surface of [the Marsdens' property] by operations which it may conduct on adjoining or nearby lands through the drilling, operating, and maintaining of directional wells located on the surface of such adjoining or nearby lands.*
>
> . . . .
>
> 8. [The Marsdens] hereby give[] and grant[] to [Sullivan] the temporary right of ingress and egress over [and] upon the southeast corner of [the Marsdens'] land to access the drilling rig [and/or] vehicles for the purpose of drilling and completing a well. [Sullivan] agrees to repair any damage incurred to [the property] as a result of its use of said lands for access and to restore the surface to as near its original condition as practical upon conclusion of its access needs. As consideration for the rights granted herein, [Sullivan] shall pay [the Marsdens] $700.00. [Emphasis added.]

---

[4]Marcus testified that he did not attempt to negotiate enlargement of this well-setback requirement; he explained that he had believed that he did not "have the right to dictate where [Sullivan put] the well."

[5]The addendum was executed after Marcus sent a letter to Lucido with some particular requests.

[6]Marcus testified that he negotiated this provision because he "didn't want [the well site] on [his] property."

4

Before he executed the lease, Marcus sought legal advice from an attorney with whom he had worked in the past. But he did not ask Sullivan to enlarge the well-setback requirement of its drilling site from the Marsdens' property because it "never occurred to [him] . . . that [Sullivan] would put [the site] in [his] backyard."[7] At the time, Marcus believed that he would be adequately protected by the provision that the drilling could not occur on his property. He contemplated that drilling would occur "way north" of his property or on Miller's property to the south[8] of his property; he never conceived that drilling would occur close to his property. He never entered into any agreement, however, that precluded drilling on any property other than his own property.

Sullivan assigned its interest in the lease to another company, which in turn assigned the interest to Titan. In the spring of 2009, Titan entered into a surface use agreement with Miller,[9] in which Titan disclosed to her the planned location of the drilling as being property that she owned that was just north of the

---

[7]Marcus testified that when he accepted $700 to grant the easement for ingress-egress on the southeast corner of his property, he knew that the easement's purpose was to get a rig and drilling equipment up a road that borders his property and that it was possible that a drilling rig would be placed at the end of that road, but he testified that he did not know that the pad site would be constructed "in [his] backyard."

[8]Overall, Titan leased (or was assigned leases) on over six hundred acres on the "Miller Unit," including many acres that Miller owned and the acres that the Marsdens owned.

[9]Miller signed her lease in 2007. The addendum to Miller's lease established that drilling would occur on her land and gave her the right to approve the location of drilling.

Marsdens' property (and therefore just north of their house, which is at the northwest corner of their property). The agreement included provisions concerning Titan's responsibility to pay Miller specified amounts for each drilled well, to use hospital-grade mufflers on drilling rig motors and on compressors to reduce noise, and to reduce the size of the operations site from 3.5 acres to 1.5 acres upon the completion of drilling and fracking the wells. Titan also met with individuals who resided near the proposed site. The Marsdens did not attend that meeting.

Titan completed the first well in August 2009.[10] According to Marcus, the southwest corner of the drilling site is 176 feet from his house, and that well itself is a little over 300 feet away from the house. In late 2009, Titan approached Marcus concerning placing an underground pipeline across the east side of his property. He agreed to grant an easement to Empire Pipeline Corporation for the pipeline and was paid $8,470.62—a negotiated sum—for doing so. When he granted the easement, he believed that even if he had not done so, "[Titan was] going to probably be successful in getting it anyway." But he understood that Titan needed the pipeline to "get the gas from the first well to . . . market." The pipeline allowed Titan to start selling the gas rather than burning it on site.

---

[10]Titan hired independent contractors to conduct drilling and fracking at the site. The first well tested whether the subsurface area would produce enough gas to sustain other drilling.

Marcus claims that he never would have granted the easement if he believed that future production at the pad site was not possible without it.

Titan drilled two more wells at the same site in September 2011, and drilled three more wells there in the late 2012 and early 2013. According to Marcus, each well took "about two weeks to drill and two weeks to frac."

Concerning the drilling of the wells, Marcus testified,

[T]hey bring in these, you know, monstrosity of . . . rigs and they drill 24 hours a day and it's loud, it's noisy, there's clanging, there's banging, there's big, huge diesel engines running, there's diesel fumes, I mean, it's awful.

. . . .

[There are] lots of people, and they're screaming and hollering at one another, you know. And to them, you know, three o'clock in the morning is the middle of the day. So, you know, . . . I guess they don't realize people are sleeping. But . . . it's round the clock.

. . . .

. . . [Y]ou can't sleep, or you get [woken] up in the middle of the night. If you get woken up, you know, it's hard to go back to sleep. You can't go outside sometimes because of the noise, because of the diesel fumes, depending upon which way the wind's blowing. I mean, it just completely disrupts your living, your day-to-day living. And that doesn't even include just being able to go out and sit in the backyard or going out and just enjoying being outside, working with the horses.

. . . .

. . . [W]hen they're drilling at night, . . . they're lighting up the well site. And I'm so close, it . . . lit up my whole house like a Christmas tree.

Although the wells have been fully drilled and fracked and although the pad site has been reduced in size, according to Marcus, large trucks still come to

7

the site at various hours of the day and leave their engines and headlights on while collecting water from tanks. The trucks make loud noises while braking, stir up dust, and release exhaust that the Marsdens can smell from their property. Marcus testified that Titan did not put a sound wall around the pad site and that there is nowhere in the home that the Marsdens can go to get away from these disturbances and other issues related to operations at the pad site, which he expects to last for years into the future.[11]

Marcus asserts that when he signed the lease with Sullivan in 2004, he had no idea what living close to a pad site would encompass, and he testified that "never in [his] wildest dreams" would he have believed that the pad site would be constructed approximately two hundred feet from his home. He initially testified at trial, "It never occurred to me until they put up stakes in June of 2009 that that's where they were going to put it. I . . . always assumed it was going to be someplace else." But Marcus appeared to concede during later testimony that he knew in 2004 that there was a possibility that the wells could be drilled in the location that is immediately north of his property.

In June 2011, after Titan drilled the first well but before it drilled other wells, the Marsdens sued Titan and Miller.[12] They alleged, in part, that Titan's drilling

---

[11]The jury watched video recordings and saw pictures that Marcus took from his property of Titan's operations at the pad site.

[12]Before trial, Miller died. The Marsdens nonsuited their claims against her.

8

activities were substantially interfering with the use and enjoyment of their property. The Marsdens brought an intentional nuisance claim against Titan. They alleged that "Titan's conduct [was] unreasonable in that it [was] abnormal and out of place in the surroundings selected and/or inadequate means were taken to protect the surrounding property [owners] and their [properties'] market value." They pled in part that Titan's drilling activities had caused "constant compressor noise, truck traffic[,] and truck pump noises." They asked for damages related to the interference of their enjoyment of the property and diminished property value.

Titan answered the suit by asserting a general denial and by pleading the affirmative defense of quasi-estoppel. Titan also sought summary judgment on the Marsdens' nuisance claim on the ground of quasi-estoppel, but the trial court denied that part of the summary-judgment motion.

The parties presented evidence to a jury at trial. Laura testified that her life was turned "upside down" when drilling began in 2009. She explained that her home had changed from a calm, peaceful abode to a continually busy, noisy, and unenjoyable environment. She opined that Titan had made the Marsdens' lives "unbearable." Laura testified that she did not read the mineral lease before she signed it and that she signed it and also agreed to the pipeline easement based on Marcus's advice. But she admitted that she knew when she signed the lease that drilling could occur somewhere on Miller's property. Also, she testified that

9

she was not aware of any industry standards that Titan violated in its operations at the drilling site.

In Marcus's testimony, he asked the jury to award damages for his family's enduring the effects of drilling, fracking, and servicing of the wells (including noise, odor, and dust) and for the associated loss of value to his home. Marcus testified that he was seeking damages for the

> complete destruction of the peace and quiet and enjoyment of [his] property[,] . . . being awoken in the middle of the night[,] . . . going outside and smelling the gas fumes[,] . . . all of the . . . traffic and the pumps on the truck[,] . . . all of the . . . compressor noises[,] and everything that goes along with that well site [that] completely disrupts a person's enjoyment of their own house.

Marcus also testified that based on an appraisal that he obtained, county taxing authorities reduced the taxable value of his property. Steve Goolsby, a real-estate appraiser, testified that by November 2011, the value of the Marsdens' property had significantly fallen as a result of Titan's operations. Marcus conceded that he had received monthly royalty checks after the production of the first well in 2009; that as of the time of the trial, he was still receiving royalties; and that he expected to receive them in the future.[13]

---

[13]The trial court sustained the Marsdens' objections when Titan attempted to introduce evidence concerning how much money the Marsdens had received from production on the six wells.

In a document that the Marsdens filed in the trial court concerning the quasi-estoppel issue, they represented,

> [The Marsdens], although damaged by Titan's tortious conduct, have not asked for the termination of the lease, the cessation of

10

Jeff Siegel, who owns land near the drilling site and near the Marsdens' property, testified that after he saw stakes at the drilling site, he became concerned about the location of the drilling. Based on those concerns, Siegel and other landowners (but not the Marsdens) attended a meeting with Titan's representatives.

Siegel described the noise made by a compressor at the drilling site as "massive." His testimony about the environmental changes (such as increased noise, traffic, smells, and light) brought about by drilling near his residence was consistent with the Marsdens' testimony in that regard. Siegel testified that when he expressed concerns about operations at the drilling site to Titan, Titan never declined to meet with him.

Chris Hammack, a petroleum engineer who worked for Titan from 2008 through 2013 and was involved in managing the planning and operation of the pad site near the Mardsens' property, testified that Titan obtained a permit from the Texas Railroad Commission for each of the six wells that it drilled on the site. He explained that in choosing the pad-site location, he considered several factors, including topography (preferring flat land and needing to avoid drilling near waterways because of environmental concerns), ingress-egress access,

---

operations at the well site, or any alteration of the manner in which the operations at the well site are presently conducted. [The Marsdens] have accepted and will continue to accept their royalty payments for the extraction of the oil, gas and other minerals under [the Marsdens'] property.

and access to existing pipelines. He described the pad site near the Marsdens' property as "very good" based on those factors. He stated that Titan considered but rejected another site that had poorer topography and sloped toward a river, which could have created environmental problems if there had been an accident at the site.[14] Hammack explained that property that Miller owned to the south was not an acceptable location for the pad site because Titan would not have been able to drill all six wells from that site and would have needed to drill at another site on the pooled unit.

Hammack testified he knew of only one time that the Marsdens directly contacted Titan concerning operations at the site and that the contact involved "an issue with some water backing up on" their property. Hammack stated that Titan quickly resolved this issue.

Hammack explained that in August 2009, during the drilling of the first well at the site, he received a letter from Dan Curlee, an attorney who represented a group of people (including the Marsdens) who owned land near the site. The letter asked Titan to be a "good neighbor" and expressed concerns about the environmental (including noise) effects of drilling, the safety of children who played in the area of the pad site, and Titan's trucks' impacts on local roads. The

---

[14]Marcus conceded in his pretrial deposition (which was read into the record as evidence at trial) that Miller's property that is farther north of his property slopes toward a river but that the part of Miller's property where drilling occurred was flat. The Marsdens did not call any expert witness to dispute Hammack's opinion that the tract just north of the Marsdens' property was the most appropriate site for drilling.

letter asked Titan to seek "creative ways that Titan [could] minimize its impact on the community," but it did not ask Titan to stop drilling at the site. Apart from the letter from Curlee and the Marsdens' complaint about water that was pooling on their property, Hammack could not recall a time in which the Marsdens complained about circumstances related to the completion of the wells.

Hammack agreed that fracking operations can "create sound," but he described the rig near the Marsdens' property as "very quiet." While he agreed that a landowner near the pad site could hear the operations, he did not concede that the noise qualified as a nuisance.

Hammack testified that he did not know whether Titan would have drilled the wells on Miller's property near the Marsdens' property if the Marsdens had not signed the mineral lease. But Hammack testified that in placing the wells on Miller's property near the Marsdens' residence, Titan relied on the terms of the Marsdens' lease that allowed such placement.

James Yelverton, a production superintendent for Atlas Barnett (Atlas),[15] testified that he manages day-to-day operations at drilling sites, including the site near the Marsdens' house, after the completion of drilling and fracking. He explained that in 2012, the compressor at the site on Miller's property, which typically never stops running, had a hospital-grade muffler that was "supposed to have the highest decibel sound reduction possible." Yelverton explained that in

---

[15]Atlas acquired Titan in 2012.

13

May 2013, a larger compressor was installed at the site to accommodate three new wells, and like the previous compressor, it was surrounded by walls but had an open top so that emissions could flow away from the compressor. The new compressor also had a hospital-grade muffler, but landowners (excluding the Marsdens) complained about the noise of the new compressor, and Yelverton responded by adding "some barrier around the bottom of the sound wall." Yelverton testified that he later oversaw the installation of a newer and higher-quality hospital-grade muffler. Yelverton also testified that he responded to complaints about truck traffic at the site by requiring that the trucks could only come to the site during daylight hours. But Yelverton testified that the Marsdens never contacted him to express their complaints about the site. Yelverton explained that nothing has happened at this well site that is different from the operations at all of the other well sites that he manages across the North Texas region.

Danny Brown, Titan's oil-field operations manager beginning in 2010, was involved in operations at the drilling site until January 2013, when he retired. Brown managed construction at the site and the completion of wells. Like Yelverton, Brown testified that he remedied concerns of landowners near the drilling site (including complaints about truck traffic, an odor, and noise from a compressor), but he explained that during the entire time that he worked on the site, he never heard from the Marsdens. Brown admitted that even after the Marsdens sued Titan, Titan did not build a sound wall around the drilling site, but

14

he testified that no one ever asked Titan to build one.[16]  Brown testified that a sound wall may be dangerous for workers on the drilling site because it traps heat within the drilling location and limits workers' ability to get out of the location in the event of an emergency.  Finally, like Yelverton, Brown testified that during the time he worked at the site, nothing extraordinary—including any abnormal noises or odors—occurred in drilling and fracking.

After the parties concluded their presentation of evidence and arguments, the jury—specifically, ten of the twelve jurors—found that Titan had intentionally created a temporary private nuisance and that the Marsdens were not estopped from complaining about the nuisance based on their acceptance of benefits.  The jury awarded $18,000 separately to Marcus and Laura.  The trial court entered a final judgment that, in accordance with the jury's verdict, awarded Marcus and Laura $18,000 each.

After the trial court entered the judgment but while the court still had plenary power, Titan filed a motion for judgment notwithstanding the verdict.  Titan asked the trial court to disregard the jury's negative finding concerning estoppel and to find as a matter of law that quasi-estoppel precluded the Marsdens' lawsuit.  The trial court denied Titan's motion.  Titan brought this appeal.

---

[16]Marcus conceded that he never asked Titan to put a sound wall around the site during Titan's drilling or fracking.  Hammack testified that he has ordered that a sound wall be erected around a drill site in the past and that such a sound wall costs between $75,000 and $150,000.

15

## Quasi-Estoppel

Titan argues that the trial court erred by denying its motion for judgment notwithstanding the verdict on the basis that it proved its quasi-estoppel affirmative defense as a matter of law. A trial court may render judgment notwithstanding a jury's verdict if a directed verdict would have been proper. Tex. R. Civ. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). A directed verdict is proper when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent or when the evidence is insufficient to raise a material fact issue. *Farmers Grp. Ins., Inc. v. Poteet*, 434 S.W.3d 316, 331–32 (Tex. App.—Fort Worth 2014, pet. denied). More specifically, "a trial court may direct a verdict for the defendant if . . . the evidence conclusively establishes a defense to the plaintiff's cause of action." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *see Browning v. Johnson*, 729 S.W.2d 331, 334 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

Because we review the denial of a judgment notwithstanding a verdict under legal sufficiency principles, we reverse only when "the law does not allow reasonable jurors to decide otherwise." *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). In our review, we credit evidence favorable to the verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827; *see Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

16

Titan contends that the evidence conclusively establishes each element of its quasi-estoppel affirmative defense. Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken; the doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced or from which he accepted a benefit. *Little v. Delta Steel, Inc.*, 409 S.W.3d 704, 711 (Tex. App.—Fort Worth 2013, no pet.) (citing *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000)); *see Brooks v. Brooks*, 257 S.W.3d 418, 423 (Tex. App.—Fort Worth 2008, pet. denied) (explaining that "unlike equitable estoppel, quasi-estoppel requires no showing of misrepresentation or detrimental reliance"). Thus, quasi-estoppel forbids a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects.[17] *Little*, 409 S.W.3d at 711; *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 770 (Tex. App.—Fort Worth 2010, no pet.); *see also Carle v. Carle*, 149 Tex. 469, 472, 234 S.W.2d 1002, 1004 (1950)

---

[17]Accordingly, jury question number three defined estoppel by stating that it

> precludes a party having knowledge of the facts from accepting the benefits of a transaction and then taking a later inconsistent position in order to avoid corresponding obligations or effects. It applies when it would be unconscionable to allow a person or party to maintain a position inconsistent with one in which he acquiesced or from which he earlier accepted a benefit.

Applying this definition, the jury found that the Marsdens were not "estopped from complaining of any private nuisance to them."

17

(explaining that acceptance-of-benefit principles preclude a party from treating a transaction as both "right and wrong"). For quasi-estoppel to apply, the party being estopped must have had knowledge of all material facts at the time of the conduct on which estoppel is based. *See Nash v. Beckett*, 365 S.W.3d 131, 144 (Tex. App.—Texarkana 2012, pet. denied); *Lindley v. McKnight*, 349 S.W.3d 113, 133 (Tex. App.—Fort Worth 2011, no pet.).

We have applied the principles of quasi-estoppel in several cases. In *Little*, we held that a widow's application for and receipt of workers' compensation benefits after her husband's death precluded her later argument that his employer did not have workers' compensation coverage and therefore precluded a negligence claim against the employer. 409 S.W.3d at 710–16. In *Lindley*, we concluded that an estate's acceptance and retention of benefits that were made available to the estate under the express terms of shareholders' agreements foreclosed the estate's ability to later challenge the validity of those agreements. 349 S.W.3d at 131–32 ("We conclude that it would be unconscionable to allow [the] estate to retain the benefit it received for the redemption of . . . shares while it concurrently challenges the provisions of the shareholders' agreements that made the redemption possible."). Similarly, in *Doe v. Texas Association of School Boards, Inc.*, we decided that quasi-estoppel precluded a mother from settling claims on behalf of her daughter and receiving money but later contending that her daughter was not competent to enter the settlement. 283 S.W.3d 451, 464 (Tex. App.—Fort Worth 2009, pet. denied); *see*

18

*also Albert v. Dunlap Exploration, Inc.*, 457 S.W.3d 554, 558, 564–65 (Tex. App.—Eastland 2015, pet. denied) (holding that quasi-estoppel precluded an oil and gas company from contending that it did not have authority to drill two wells after the company had received production proceeds from the wells); *Moore v. Jet Stream Invs.*, 261 S.W.3d 412, 430 (Tex. App.—Texarkana 2008, pet. denied) (op. on reh'g) ("Jet Stream successfully requested that Moore be temporarily enjoined from ceasing production and accepted the benefit of that position. As such, Jet Stream should be estopped from alleging Moore's conduct, *which Jet Stream requested and benefitted from*, was wrongful." (emphasis added)).

Well before these decisions, in *Ainsworth v. Oil City Brass Works*, our sister court of appeals in Beaumont applied similar estoppel principles in a nuisance context and to facts that are analogous to those in this case. 271 S.W.2d 754 (Tex. Civ. App.—Beaumont 1954, no writ). There, C.H. Ainsworth sold property to Oil City Brass Works while knowing that the property would be used to establish a forge shop. *Id.* at 755–56. Years later, Ainsworth's successors, who owned property adjacent to the forge shop, complained about noise and vibrations coming from the shop, which conducted operations on a twenty-four hour basis. *Id.* Oil City Brass Works sought a declaratory judgment that estoppel precluded the complaints. *Id.* at 757. The Beaumont court affirmed the trial court's judgment on estoppel, explaining,

19

We believe that the trial court properly held that the [successors] are estopped to complain of [Oil City Brass Works's] ordinary, careful, and prudent installation and use of the forging plant on that property . . . . *It was naturally to be expected and contemplated that when [Oil City Brass Works] bought the property and acquired thereby under the facts before us the right to operate thereon on a forging shop, it could thereafter operate whatever type of machinery and hammers the growth of its business and the development of the industry in which it was engaged would require it to use in the course of its business.*

*Id.* at 763 (emphasis added).[18]

We conclude that the principles that led us to employ quasi-estoppel in *Little*, *Lindley*, and *Doe* and that led the Beaumont court to recognize estoppel in *Ainsworth* have equal persuasion when applied to the facts of this case. The undisputed evidence establishes that the first negotiated term of the addendum to the Marsdens' oil and gas lease expressly allowed Titan (as Sullivan's assignee) to "prospect, drill, and produce oil and gas from beneath the surface of [the Marsdens' property] *by operations . . . on adjoining*[19] *or nearby lands*

---

[18]The two cases that the Marsdens rely on are distinguishable because those cases did not concern landowners' acceptance of benefits from a defendant that was incompatible with a nuisance claim against that defendant. *See Vann v. Bowie Sewerage Co.*, 127 Tex. 97, 101, 90 S.W.2d 561, 563 (1936) (holding that estoppel did not preclude damages for personal injuries when a party bought land adjacent to a sewage company and did not know of certain conditions related to the company's operations); *Blocher v. McArthur*, 303 S.W.2d 529, 535 (Tex. Civ. App.—Austin 1957, writ ref'd n.r.e.) (concluding that estoppel did not preclude apartment residents from suing for nuisance when an adjoining landowner caused the overflow of water into the apartment, raised a retaining wall at the residents' request to abate the overflow, but still caused water seepage into the apartment).

[19]"Adjoining" means "[t]ouching" or "sharing a common boundary." Black's Law Dictionary 49 (10th ed. 2014).

through the drilling, operating, and maintaining of directional wells *located on the surface of such adjoining or nearby lands*." [Emphasis added.] And the first numbered paragraph of the lease particularly informed the Marsdens what such "operations" comprised; the paragraph explained that the developer could drill for, produce, and transport oil and gas by "gravity and magnetic methods[;] injecting gas, water[,] . . . other fluids, and air into subsurface strata[;] laying pipe lines[;] [and] building roads, tanks, power stations, telephone lines[,] and other structures."

In exchange for these allowances granted by the Marsdens, they received a per-acre bonus, and their lease entitled them to receive a royalty. The evidence establishes that they have received monthly royalty payments since the beginning of production at the drilling site. Marcus testified that he has received everything that he is entitled to under the lease and that he has never offered to return any of the money he has received from Titan.[20]

Marcus recognized that the terms of the bargain that he struck in his lease were that drilling could not occur on his property but that the southeast corner of his property could be used to travel to a drilling site and that drilling could occur on adjoining land. He acknowledged that the tract where the pad site was built adjoins his property. He also testified that he did not attempt to negotiate an agreement that a well would not be placed on the part of Miller's property that

---

[20]On appeal, the Marsdens concede that they "have been paid royalties under the mineral lease and will continue to receive them in the future."

adjoins his property. In his deposition, which was introduced at trial, Marcus testified that when he discovered that Titan was planning on drilling close to his property, he did not approach Titan about moving to a different site because he "ran out of time" and because he "didn't really see that there was any other option or that [Titan] would entertain any other option."

Furthermore, Marcus conceded while testifying that he was not alleging that Titan was negligent in its drilling operations. He also admitted that he did not know of any laws that Titan had broken or permits that Titan had violated in drilling. Without contravening evidence, Titan's witnesses testified that nothing occurred in the drilling and fracking of the wells near the Marsdens' property that would not have been routine in drilling or fracking anywhere else.

Against this backdrop, although the Marsdens argue that they never "sought to terminate the mineral lease," the filing and maintenance of their nuisance suit against Titan serves as a de facto attempt to repudiate the part of their bargain in which they permitted Titan's ability to conduct routine drilling operations on adjoining land while they continue to enjoy the financial benefit of that bargain and seek yet another recovery that the bargain did not contemplate. We conclude, as a matter of law, that such a result is unconscionable and is barred by quasi-estoppel. *See Little*, 409 S.W.3d at 710–16; *Lindley*, 349 S.W.3d at 131–32; *Ainsworth*, 271 S.W.2d at 763.

The Marsdens contend that the operation of gas wells "less than 300 feet from their home" was "far closer than [they] ever agreed." But their lease and

22

addendum allowed Titan to drill on an adjoining property and restricted the location of the drilling only so that it could not occur within 200 feet of any residence or barn. The Marsdens do not argue that Titan violated this setback provision. And although they contend on appeal that the provision "is not applicable in this case," Marcus conceded at one point in his testimony that if the setback had been 600 feet, Titan would have had to drill "someplace else."[21] He also admitted that he did not attempt to negotiate a larger setback.

Also, the Marsdens contend that they "expected that the well site would be placed on . . . [Miller's property] north of the location where the gas wells were drilled," and Marcus's testimony, viewed in the light most favorable to the verdict, supports this contention. But even recognizing that the Marsdens did not originally contemplate the exact location of drilling as being directly north of their property,[22] they thereafter accepted and retained (and will continue to receive) benefits flowing exclusively from the lease that objectively authorized drilling there and from production at the very site that they complain about. *Cf. Lindley*, 349 S.W.3d at 133 ("[E]ven if there was some point in the past when Daws did not know of the [shareholders' agreements'] transfer restrictions . . . , Daws's

---

[21]Later, he appeared to opine that the addendum mooted the setback because the setback applied only if Titan drilled a well on his property, which the addendum prohibited.

[22]We note that the Marsdens do not base their appellate argument on any alleged misrepresentation from Titan that the drilling site would not be on the property immediately north of their property.

estate . . . *accepted the benefit in question . . . at a time that it knew all facts* regarding the distribution of that benefit and the actual rejection of the transfer . . . ." (emphasis added)); *see also Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex. 1971) (holding that quasi-estoppel did not apply because the appellant, who had orally leased land annually, did not have knowledge of a three-year lease that was executed by her children at the moment she accepted $1,225 in rent).

Moreover, as Titan argues, after the Marsdens had concrete knowledge of the pad-site location and of the environmental changes brought about by drilling and fracking—indeed, after the first well was completed and was producing— they accepted a new benefit related to operations at the site when they received $8,470.62 in exchange for granting the pipeline easement across their property so that the gas could be marketed and sold (and so that royalties could therefore be remitted).[23] *Cf. Lindley*, 349 S.W.3d at 133. In other words, while the Marsdens contend that they "never had knowledge that the Titan wells would be placed on the 6-acre tract immediately behind their home at the time they signed the mineral lease," they undisputedly had knowledge of the wells' location at the time they accepted financial benefits related to the production of gas there. *Cf. id.*; *see also Little*, 409 S.W.3d at 713 (holding that quasi-estoppel applied

---

[23]Marcus testified that at the time Titan approached him about the pipeline easement, he was "[p]robably" already considering suing Titan.

24

because the widow had knowledge of all material facts "related to her acceptance of benefits *while she continued to accept them*" (emphasis added)).

In summary, we conclude that as a matter of law, quasi-estoppel precludes the Marsdens' nuisance suit because they have unconscionably accepted benefits of transactions—their lease and easement agreement—while taking positions that inconsistently attempt to avoid the obligations and effects (including all of the circumstances forming the gravamen of their nuisance claim) of those same transactions. *See Little*, 409 S.W.3d at 711–16; *Clark*, 327 S.W.3d at 770. We hold that the evidence conclusively established Titan's quasi-estoppel affirmative defense and that the trial court therefore erred by denying Titan's motion for judgment notwithstanding the verdict. *See* Tex. R. Civ. P. 301; *Prudential Ins. Co. of Am.*, 29 S.W.3d at 77; *Fort Bend Cnty. Drainage Dist.*, 818 S.W.2d at 394. We sustain Titan's sole issue.

## Conclusion

Having sustained Titan's only issue, we reverse the trial court's judgment and render a judgment that the Marsdens take nothing. *See* Tex. R. App. P. 43.2(c); *Bryant v. S.A.S.*, 416 S.W.3d 52, 60–61 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and SUDDERTH, JJ.

DELIVERED:  August 27, 2015